TRANSCRIBED FROM DIGITAL RECORDING
2:23-cr-00111-GMN-DJA - June 10, 2024          1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEVADA

3  UNITED STATES OF AMERICA,      )  CASE NO. 2:23-cr-00111-GMN-DJA
                                  )
4              Plaintiff,         )  Las Vegas, Nevada
                                  )  June 10, 2024
5       vs.                       )  Courtroom 7D
                                  )
6  ANTHONY LEWIS HAMELIN,         )  Recording method:  Liberty/ECRO
                                  )  10:05 a.m. - 10:44 a.m.
7              Defendant.         )  IMPOSITION OF SENTENCE
   _____)
8                                    *C E R T I F I E D   C O P Y*

9

10

11                 TRANSCRIPT OF PROCEEDINGS

12          BEFORE THE HONORABLE GLORIA M. NAVARRO,
                UNITED STATES DISTRICT COURT JUDGE
13

14
   APPEARANCES:  (See next page)
15

16  Recorded by:  Araceli Bareng

17  Transcribed by:      PAIGE M. CHRISTIAN, RMR, CRR, CCR #955
                         United States District Court
18                       333 Las Vegas Boulevard South
                         Las Vegas, Nevada  89101
19

20

21

22

23

24  Proceedings recorded by electronic sound recording.
    Transcript produced by mechanical stenography and computer.
25

1  **APPEARANCES:**

2

3  For the Government:

4          **JACOB HAILE OPERSKALSKI, AUSA**
           *UNITED STATES ATTORNEY'S OFFICE*
5          501 Las Vegas Boulevard South
           Suite 1100
6          Las Vegas, NV 89101
           (702) 388-6336
7          E-mail: jacob.operskalski@usdoj.gov

8

For Defendant Anthony Lewis Hamelin:

9

           **JOANNE L. DIAMOND, AFPD**
10         *OFFICE OF THE FEDERAL PUBLIC DEFENDER*
           411 E. Bonneville Avenue
11         Suite 250
           Las Vegas, NV 89101
12         (702) 388-6577
           E-mail: joanne_diamond@fd.org
13

14

15

16  ALSO PRESENT:  Matt Holden, USPO; Jordan Pickron, USPO

17                          * * * * * *

18

19

20

21

22

23

24

25

1          LAS VEGAS, NEVADA; JUNE 10, 2024; 10:05 A.M.

2                         --o0o--

3                P R O C E E D I N G S

4          **COURTROOM ADMINISTRATOR:**  This is the time set for

5  the imposition of sentence in Case No. 2:23-cr-00111-GMN-DJA,

6  United States of America vs. Anthony Lewis Hamelin.

7          Counsel, your appearances, please.

8          **MR. OPERSKALSKI:**  Good morning, Your Honor.  Jake

9  Operskalski for the United States.

10          **THE COURT:**  Good morning, Mr. Operskalski.

11          **MS. DIAMOND:**  Good morning, Your Honor.  Joanne

12  Diamond with the Federal Public Defender's Office with

13  Mr. Hamelin, who is present and in custody.

14          **THE COURT:**  Good morning, Ms. Diamond.

15          And good morning, Mr. Hamelin.

16          And we also have from the probation office?

17          **OFFICER HOLDEN:**  Good morning, Your Honor, Matt

18  Holden from Probation, and joining me is the new officer, Jordan

19  Pickron.

20          **THE COURT:**  Ah, good morning.  Thank you for joining

21  us today.

22          So, we had a new development here over the week.  We

23  received, I think, four -- up to four different envelopes with

24  letters handwritten by Mr. Hamelin addressed to the Court

25  delivered here to the court from the Pahrump jail.  And so, I'm

1  going to find that the attorney-client privilege has been waived

2  by him providing these letters directly to the Court.

3          And so, I did ask my staff to make copies of these

4  letters.  They will be filed on the docket.  But, I wanted you to

5  have them because it will take awhile before they get docketed

6  because it's a Monday.  So, they will have other things that

7  they're having to file, as well.

8          I wanted you all to have a copy of these letters so

9  you can read them.  They're handwritten, so they're not the

10  easiest to read, but the handwriting's not bad.  I'm just saying

11  it's not as easy as reading type.

12          It's clear to me that Mr. Hamelin has a concern about

13  the voluntariness of his plea.  He is advocating for the Court to

14  allow him to withdraw his guilty plea.  He does not feel that he

15  entered into the guilty plea voluntarily at the time that we had

16  the change of plea hearing.

17          He has had some concerns with his mental capacity,

18  and there was, apparently, at some point, some kind of an

19  evaluation that was scheduled but didn't happen and was waived

20  because instead, there was an offer to plead guilty.  And so,

21  that's how he ended up pleading guilty.

22          And I'm -- I'm oversimplifying the situation, and you

23  all can put more records -- more information on the record if

24  you'd like.  But, the point is that under Federal Rule of

25  Criminal Procedure 11(d)(2)(B), a defendant may withdraw a plea

1    of guilty after the Court accepts the plea but before it imposes

2    sentence if the defendant can show a fair and just reason for

3    requesting the withdrawal.  The decision to allow a defendant to

4    withdraw his plea lies with the discretion of the district court,

5    and I am citing from *United States v. Ruiz*, R-U-I-Z, a Ninth

6    Circuit case from 2001, decided en banc.

7          Although the defendant bears the burden of

8    establishing a fair and just reason, the fair and just standard

9    is applied liberally, and I'm quoting from *Yamashiro*, 2015 Ninth

10   Circuit case, as well as *Bonilla*, a 2011 case.

11          A defendant may not withdraw his guilty plea simply

12   on a lark, and that's from *United States v. Hyde*, H-Y-D-E, a

13   1997 U.S. Supreme Court case.  The district court must review

14   each case in the context in which the motion to withdraw guilty

15   plea arose to determine whether a fair and just reason exists.

16   And that's from *McTiernan*, M-C, capital T-I-E-R-N-A-N, a Ninth

17   Circuit 2008 case.

18          So, fair and just reasons for withdrawal

19   include -- there's five different things:  Number one, inadequate

20   Rule 11 plea colloquy.  That's not been raised;

21          Number two, erroneous or inadequate legal advice.

22   That's not been raised;

23          Number three, newly discovered evidence.  That hasn't

24   been raised;

25          Number four, intervening circumstances.  Maybe has

TRANSCRIBED FROM DIGITAL RECORDING
2:23-cr-00111-GMN-DJA - June 10, 2024         6

1   been raised because he did talk about some things at the Pahrump

2   jail that he's concerned with;

3              But, number five is, any other reason for withdrawing

4   the plea that did not exist when the defendant entered his plea.

5              So, the situation here is one that he's claiming did

6   exist at the time that he entered his plea, but it is a mental

7   illness issue that he's raising, so I think, again, the -- the

8   liberal standard does apply.

9              The burden of establishing a fair and just reason, as

10  I said, you know, is -- lies with the defendant.  So it is

11  Mr. Hamelin's burden to show that the plea of guilty was not

12  voluntary.  He says in the letter he would have pled guilty to

13  the Lindbergh (phonetic) child kidnapping if that were the case

14  and that he was just wanting to get out early because his cousin

15  has cancer, also because he was hoping to get some medical

16  treatment.  He claims he's not getting medical treatment at the

17  Pahrump jail.

18             He does -- and I think it was the fourth

19  letter -- say that he is guilty of a different statute but not

20  the one that he plead guilty to.

21             Okay.  So, that's my summary, and then I'll open it

22  up.  Because it is the defendant's motion, I'll give Ms. Diamond

23  the first opportunity to address, what should the

24  Court -- what -- in your position, you know, what's your

25  argument?  What do you think that the Court should do with the

1   letters?

2          **MS. DIAMOND:**  Thank you, Your Honor.  I've spoke to

3   Mr. Hamelin about the letters.  I think the problem was a timing

4   situation.  So all of these letters were written by Mr. Hamelin

5   while I was out of the country on vacation, so I was not able to

6   accept his calls.

7          And Mr. Hamelin is spiralling.  This is a symptom of

8   his bipolar disorder.  He's been spiralling.  And I'm normally

9   able to calm him down through conversation, explain what's going

10  on, and I wasn't available to him.

11         He has made clear that he doesn't want to withdraw

12  his plea; that it was, again, because of that mental health

13  spiral, him just trying to get out of Pahrump.  And he thought

14  that this would be a quicker way of doing it.

15         I explained to him that there's nothing quick about

16  this process.  If he withdraws his plea, probably would need new

17  counsel, potentially.  It resets everything.  And if his goal is

18  to get to BOP, get better mental health treatment, this is the

19  way to do it.  But I made very clear to ask him, Are you sure you

20  feel comfortable that you were competent when you entered your

21  plea? because I don't want to dissuade you from that.  If that is

22  what you're saying, that you weren't, then absolutely we need to

23  do this.

24         And he said no.  He just wanted to get out of

25  Pahrump.  It's a symptom of his illness.

1        And he has expressed to me when we met and also this

2 morning that he wishes to go forward with sentencing; that the

3 letters that he wrote to the Court were a product of his

4 spiralling mentally while I was unavailable to him.

5        **THE COURT:** So what medication -- I was looking back

6 to see on my notes.  I usually write down any medication that

7 someone is taking.

8        I had written down at the time of his change of plea,

9 when I asked him what medication he was taking, he was taking

10 three prescriptions, a psychotic medication since August of 2023.

11 The other one, I think, was Abilify, but also insulin.

12        So was he being treated or not being treated, I

13 suppose, is the first question?

14        **MS. DIAMOND:** Being treated.  So the current

15 medications are at paragraph 82 of the PSR, Aripiprazole,

16 A-P -- A-R-I-P-I-P-R-A-Z-O-L-E, 20 milligrams; topiramate,

17 T-O-P-I-R-A-M-A-T-E --

18        **THE COURT:** I'm sorry.  What paragraph are you on?

19        **MS. DIAMOND:** Paragraph 82, page --

20        **THE COURT:** Oh, 82.  I thought you said 32 --

21        **MS. DIAMOND:** Sorry, Your Honor.

22        **THE COURT:** Okay.  Thank you.

23        **MS. DIAMOND:** Topiramate, 50 milligrams.  That one's

24 twice a day.  And lamotrigine, brand name, Lamictal, a hundred

25 milligrams once a day.

1          I asked Mr. Hamelin, Are you taking your medications?

2          And he said yes.  But as he said to me, medications

3    are not a magic pill, and they don't stop all of his symptoms.

4          So, he tells me he is in compliance with his

5    medications, but that has not stopped this spiralling.  He

6    just -- and I -- I frankly agree with him.  I don't think Pahrump

7    is set up for folk with his level of mental illness.  It's a

8    temporary facility.  They're not a medical facility.  They do the

9    best they can.

10          But, he -- he's sick.  He's been sick for decades,

11    and, you know, he's just not in an ideal situation for his

12    illness.  And despite the medications, he's been spiralling

13    recently.

14          **THE COURT:**  All right.  So starting with paragraph 74

15    of the presentence report, it does state the defendant has a

16    significant mental health history dating back to 1992, and it's

17    several paragraphs long and ends with paragraph No. 85.

18          What is the government's position?

19          **MR. OPERSKALSKI:**  Thank you, Your Honor.  I would

20    just make a, first, just for the record, a very minor clarifying

21    point.  When the defendant raised in motion practice his

22    competency, it was raised that he was insane at the time of the

23    offense so that he would be not guilty by reason of insanity, not

24    that he was not competent to enter a plea or to proceed to trial.

25    So this would be, I believe, a different and new issue.

1          I am very troubled by these letters, though,

2     considering the nature of them.  And I would just ask, even

3     though it is the defendant's burden to establish that he is not

4     competent and in order to withdraw his plea, that the Court still

5     actually engage in colloquy with him to make sure that at this

6     point today, he feels that he was competent to enter into that

7     plea and that he feels comfortable going forward with sentencing.

8          Thank you.

9          **THE COURT:**  So my understanding of the letter is that

10    he's saying that he was insane at the time of the offense and

11    that he would like to go to trial and plead; that he was, you

12    know, guilty but insane and hopefully then receive some kind of

13    inpatient treatment at a facility.  And, in fact, he claims that

14    he would even waive his presence at trial in order to speed that

15    up.

16         So, that is the Court's concern is if he's making

17    decisions not based on whether or not he thinks -- or admits that

18    he's guilty of the offense to which he plead guilty, but rather,

19    he's making his decisions based on his perception of speed and

20    ability to get into a medical facility for inpatient treatment,

21    which it appears he has been hospitalized before and -- and, you

22    know, done, you know, significantly better after he's been

23    hospitalized in a psychiatric hospital.  So, it makes sense that

24    that's his -- that's what he's looking forward to.

25         So that does concern the Court.  I -- I'm not sure

1   whether he's really voluntarily pleading guilty or if he is just

2   taking this deal because he doesn't understand the process and

3   just is trying to speed it up.  Not because Ms. Diamond hasn't

4   tried to explain it to him, but -- I mean, let me go back here

5   and look at the recommendation.

6          Has he had a chance to look at the PSR now?

7          **MS. DIAMOND:**  Yes, Your Honor.  We've looked at the

8   PSR, and he gave me some suggestions for probation, so he was

9   active in that PSR review process.

10         **THE COURT:**  Okay.  Because probation is not what's

11  being recommended, right?  There's --

12         **MS. DIAMOND:**  Oh, I meant for the probation officer.

13         **THE COURT:**  Okay.

14         **MS. DIAMOND:**  Yeah.  Absolutely.

15         **THE COURT:**  Okay.  Because statutory provisions for

16  Count 1 is up to ten years in prison; for Count 2, up to five

17  years in prison.  The guideline range is 46 to 57 months.  And

18  the recommended sentence is 46 months per count but to be run

19  concurrently, so that's almost four years.

20         And he believes that he would be in a mental

21  facility, in a mental hospital, and not in the prison during that

22  time?

23         **MS. DIAMOND:**  No, Your Honor.  So, he understands

24  that he would be in BOP.  He's going to request the Court

25  recommend him to a BOP medical facility.

1          Mr. Hamelin's understand -- it -- when he talks about

2    a mental health facility, he's talking if he had gone to trial,

3    been convicted -- been found not guilty by reason of insanity,

4    that he would be in some kind of facility.  So it's kind of

5    confusing the two.

6          He understands that under the plea agreement, if he

7    is sentenced by the Court, we can ask him to go to a BOP medical

8    facility.  But when we were in the position where we intended to

9    plead not guilty by reason of insanity, A, he knew that BOP would

10   take him to a medical facility for an evaluation.  That's what we

11   were waiting for.  It took them a really long time.  They didn't

12   come.  And in the process of that time is when Mr. Hamelin wanted

13   to reopen negotiations with the government, and that's why we

14   asked the Court to stay its order directing him to be sent for an

15   evaluation, because we didn't want him to go right when we'd

16   reached an agreement, and then he would have to try and him back.

17         So, there was a long delay on BOP's part, and then we

18   contributed to that delay by asking the Court to stay the order

19   so that we could have that.

20         So, he understands that if that process had gone

21   through and he'd been found not guilty by reason of insanity,

22   that would have led to some kind of medical facility.

23         **THE COURT:**  Does he agree that if he withdraws the

24   request made in these four letters and we go forward with

25   sentencing and if he receives the 46-month sentence that the

1  parties jointly recommended or agreed to recommend in the plea

2  agreement, that he will not be going to a medical facility?

3          He'll be going to a prison for 46 months, you know,

4  minus good time credit, but essentially, he's not going to be

5  sent to a medical -- I mean, it could be a prison that has some

6  medical --

7          **MS. DIAMOND:**  That's where he wants to go, Your

8  Honor.  So he's been in BOP before, so he knows what services BOP

9  has.  He just wants to go to a BOP medical prison because he

10 knows they have the ability to treat him.

11         He's been in BOP twice before for similar offenses.

12 He knows his way around BOP.  He's not afraid of being in BOP.

13 But he wants to be in a BOP facility that is able to manage his

14 symptoms in a way that Pahrump cannot.  And Mr. Hamelin's very

15 versed with this and, you know, comfortable.

16         You know, if the Court wants to hear from Mr. Hamelin

17 on this issue, I know he -- he, more than anyone, knows what his

18 treatment needs are and what his wishes and understanding are.

19 He's very able to convey that to the Court.

20         **THE COURT:**  All right.  Mr. Hamelin, you do have an

21 attorney here, so you're not required to make any statements

22 without your attorney.  Your attorney can speak for you.

23         **THE DEFENDANT:**  Yeah.

24         **THE COURT:**  But because you filed these letters, I

25 have concerns --

1              **THE DEFENDANT:**  True.

2              **THE COURT:**  -- that you've raised.  So I need to ask

3    you some questions.

4              **THE DEFENDANT:**  Okay.

5              **THE COURT:**  So are you willing to answer my questions

6    so I can determine whether or not your plea --

7              **THE DEFENDANT:**  Yes, Judge.

8              **THE COURT:**  -- was voluntary?

9              **THE DEFENDANT:**  Yes, Judge.

10             **THE COURT:**  All right.  So you heard the statements

11   of Ms. Diamond and her explanation.

12             **THE DEFENDANT:**  Yes.

13             **THE COURT:**  Do you agree with what she said, or are

14   there --

15             **THE DEFENDANT:**  Yes, yes.  She explained it very

16   well.  And by pleading guilty today, I would be sent to a BOP

17   facility, and hopefully, the judge would -- you, Your Honor,

18   would recommend that I go to a BOP medical facility, whether it

19   be Rochester, Minnesota, or Springfield, Missouri, or something.

20   And usually, the BOP would -- would recognize the judge's

21   recommendation where I go.  Based on the PSR as well as your

22   recommendation, they would send me to a medical facility where I

23   could get treatment.  And that's what we're hinging it on, your

24   recommendation and on the PSR.

25             Does that make sense?

1          **THE COURT:**  Yes, it does.

2          So why did you send these letters?

3          **THE DEFENDANT:**  Because I was going through a

4   downward spiral.  I couldn't reach my attorney.  I am getting

5   sick again.  I've been in Pahrump, you know, for over a year.

6   The pills aren't a magic pill.  I've been depressed.  I've been

7   sleeping in my cell.  I've been hibernating in my cell, sleeping

8   a lot, and I just need to get out of Pahrump because I need to

9   get to a medical facility, you know, as fast as possible, you

10  know.  And -- and I thought by pleading -- by sending these, I

11  could -- I could get to a medical facility as fast as possible.

12          My attorney explained this process is not the fastest

13  way.  The fastest way is to plead guilty, have you recommend

14  me -- recommend me to a medical facility, and -- and do it that

15  way, if that makes sense.

16          **THE COURT:**  So do you want to go forward and withdraw

17  your plea of guilty, or --

18          **THE DEFENDANT:**  No.  To plead guilty and have Your

19  Honor recommend I go to a medical facility within the BOP.

20          **THE COURT:**  Do you want to go forward with your

21  sentencing today on the two charges?

22          **THE DEFENDANT:**  Yes.

23          **THE COURT:**  So what has changed since -- since you

24  sent me those letters and then your change of --

25          **THE DEFENDANT:**  Nothing -- nothing's changed.  It's

TRANSCRIBED FROM DIGITAL RECORDING
2:23-cr-00111-GMN-DJA - June 10, 2024          16

1   just that this would be the fastest way for me out of Pahrump.  I

2   was going through a downward spiral, and this is the fastest way

3   that I can get treatment.

4          I'm just -- I know -- I know that -- that, you know,

5   that this is -- I know what's going on, Your Honor, and

6   Ms. Diamond explained everything to me, and I know what's been

7   said here today.

8          But, I also know how the system works, and I know

9   that -- that this is the fastest way for me to get treatment.

10  I'll languish in Pahrump.  I won't get the treatment I need.  And

11  I'll be bounced back and forth like a rubber ball.

12          This is the fastest way I can get treatment, and if

13  it means I need to go -- go to technically be considered a

14  prisoner and go to the prison and go -- be -- technically be

15  labeled an inmate but be -- but yet go to a federal medical

16  center, then that will be the best and most efficient way to do

17  it.  You know what I'm saying?  If that makes any sense, if the

18  Court recommends that I go to a medical facility as a prisoner

19  versus as a civil commitment if -- if I were to be found not

20  guilty by reason of insanity.

21          Now, as a side note, as a caveat, I would ask that

22  the government, when I come -- come up for release, you know,

23  whether it be next year sometime, you know, possibly civilly

24  commit me under 4246.  But that's a sidebar.  The government can

25  do that when they want to if I should come up for release at that

1  time, you know.  But, for now, this is the fastest way I can get

2  treatment that I need.

3           **THE COURT:**  All right.  So I can't accept a plea of

4  guilty just because you want to get treatment.  I appreciate you

5  want to get treatment, but -- I think we all want you to get

6  treatment, but I can't allow you to plead guilty only because

7  you're trying to speed up the process of getting treatment.

8           So I need to ask you about the elements of the two

9  offenses to which you plead guilty to make sure that you still

10  admit that you are guilty of these.  It sounds like you only

11  think you're guilty of one and not the other, so let me do them

12  one by one.

13           First one is Count 1, which is influencing, impeding,

14  or retaliating against a federal official by threatening a family

15  member.  And that's the violation that's under 18 U.S.C. Section

16  115(a)(1)(A).  There's two elements to the offense, and these are

17  on page 4 of the plea -- the plea agreement, if you want to look

18  there.

19           So, the first element is the defendant threatened to

20  murder a member of the immediate family of a United States

21  official; and number two, the defendant did so with the intent to

22  impede, intimidate, interfere with the United States official

23  while he was engaged in the performance of official duties or

24  with the intent to retaliate against United States official on

25  account of the performance of his official duties.

1           So, do you admit or deny that you committed Count 1,

2    influencing, impeding, retaliating against a federal officer by

3    threatening a family member?

4           **THE DEFENDANT:**  I admit that.

5           **THE COURT:**  All right.  So the second one is the

6    offense of transmitting a communication containing a threat to

7    injure under Title 18 of United States Code Section 875

8    subsection (c).  The first element is that you knowingly

9    transmitted in interstate commerce a message containing a threat

10   to injure a person, and the second element is that the message

11   was transmitted for the purpose of issuing a threat or with

12   knowledge that the message would be viewed as a threat.

13          So do you admit or deny that you committed Count 2,

14   transmitting a communication containing a threat to injure under

15   Section 875(c)?

16          **THE DEFENDANT:**  I admit that.

17          **THE COURT:**  Okay.  And so, you understand that the

18   sentence can still be up to ten years for Count 1 and up to five

19   years for Count 2?  The parties are stipulating and agreeing to a

20   46-month sentence, and that's what the probation office is

21   recommending, as well, but you understand that I could impose a

22   higher sentence?

23          **THE DEFENDANT:**  I understand, Your Honor.

24          **THE COURT:**  All right.  We did talk about restitution

25   at the time of the plea, but it sounds like there is not any

TRANSCRIBED FROM DIGITAL RECORDING
2:23-cr-00111-GMN-DJA - June 10, 2024        19

1    restitution; is that right?

2           **MR. OPERSKALSKI:**  That's correct, Your Honor.  I have

3    been in communication of the victims of this offense, and they

4    would not like to seek restitution.  So I would ask that the

5    Court, although it is mandatory under the statute, just to impose

6    a -- an amount of zero dollars because they're not seeking it at

7    all.  Thank you.

8           **THE COURT:**  And you do understand, then, Mr. Hamelin,

9    that there will be no trial.  I will simply enter a judgment of

10   guilty and sentence you today, and there will never be a trial

11   for you to plead that you committed those acts while insane.

12   There will be instead a conviction on your record.

13          Do you understand that?

14          **THE DEFENDANT:**  Yes, ma'am.

15          **THE COURT:**  And do you understand that you will also

16   have a term of supervision to follow the term of imprisonment?

17          And in this case, the term of supervision -- I

18   thought it was up to three years, but I'm trying to double-check

19   and make sure.

20          Yes.  The term of supervised release would be up to

21   three years per count, probably ran concurrent, and

22   (indiscernible) recommendation of -- of the parties and of the

23   probation office.  And while you are serving that supervised

24   release term, you would have to comply with conditions.  And if

25   you don't, you could go back to prison.

TRANSCRIBED FROM DIGITAL RECORDING
2:23-cr-00111-GMN-DJA - June 10, 2024          20

1              Do you understand that?

2         **THE DEFENDANT:**  Yes, Judge.

3         **THE COURT:**  And most importantly, do you understand

4    that if we go through with this, you will not be able to withdraw

5    your guilty plea?

6              You'll be waiving your right to appeal the guilty

7    plea and also your sentencing.  There's very limited rights that

8    you would retain to appeal.

9         **THE DEFENDANT:**  Yes.

10        **THE COURT:**  Have you talked to your attorney about

11   that?

12        **THE DEFENDANT:**  Yes.

13        **THE COURT:**  Do you feel you understand it?

14             It's written out in your plea agreement, but I want

15   to make sure you understand that this letter that you sent me

16   today -- or not today, but last week, you know, during the week,

17   these four letters.  Once there's a sentencing, it changes the

18   picture, and your burden is bigger --

19        **THE DEFENDANT:**  I understand --

20        **THE COURT:**  -- if I go through with sentencing.

21        **THE DEFENDANT:**  I understand.  Yes.

22        **THE COURT:**  But if you want me to conduct some other

23   kind of hearing to determine whether or not to withdraw your

24   guilty plea, it will be easier for you to meet your burden if we

25   do it before sentencing.

1          **THE DEFENDANT:**  No.  I understand.

2          **THE COURT:**  So do you want me to go ahead and

3    sentence you today, or do you want to take a week or so to kind

4    of think about this --

5          **THE DEFENDANT:**  No.

6          **THE COURT:**  -- I know you're in a hurry to get

7    medical treatment, but this is really important.

8          **THE DEFENDANT:**  No.  I understand what's going on.

9    We can complete the process today.

10          **THE COURT:**  Okay.

11          **THE DEFENDANT:**  Thank you.

12          **THE COURT:**  And how does the government feel about

13    that canvass?  Any other questions you want me to ask?

14          I'm more than happy to ask more questions.

15          **MR. OPERSKALSKI:**  Thank you, Your Honor.  Just one

16    brief point of clarification, and I probably misheard Your Honor.

17    But, the parties are recommending that the sentences be imposed

18    concurrently.  But, the maximum that he could be sentenced to is

19    up to 15 years imprisonment and a six-year period of supervised

20    release because the Court has the authority to sentence

21    those -- or to run those sentences concurrently.  So just to

22    clarify that.

23          But the other piece is very likely unnecessary, Your

24    Honor, but just out of an abundance of caution, I would ask the

25    Court to ask the defendant whether he is pleading guilty because

1  the facts -- factual basis in his plea agreement are true and not

2  based on these other reasons of seeking additional treatment.

3  Thank you.

4          **THE COURT:**  Thank you.

5          So you did not mishear.  I -- I did not ask him -- or

6  I did not remind him of the total amount of time that he could

7  remain in custody.

8          So, Count 1 is punishable up to ten years.  Count 2

9  is up to five years.  You might have to serve the sentence for

10  Count 1 first before you serve the sentence for Count 2, which

11  means the total amount of that you could serve under worst case

12  scenario is up to 15 years in prison.

13          Do you understand that?

14          **THE DEFENDANT:**  Yes, Your Honor.

15          **THE COURT:**  And do you understand that a supervised

16  release term for each count is three years, but you might have to

17  serve all the supervised release term for one count first before

18  you even begin serving it for the second count, so technically,

19  worst case scenario, you could have to serve up to six years of

20  supervised release.

21          Do you understand that?

22          **THE DEFENDANT:**  Yes, Your Honor.

23          **THE COURT:**  And then, in your guilty plea agreement,

24  there are facts -- let me go back to those -- on page 7.  Starts

25  at the bottom of page 7.  They're pretty short, so I'm just going

1   to read them, and you can tell me if that's still true or not.

2                  It says, In the late evening of June 1 of 2023 and

3   the early morning of June 2nd of 2023, you made threatening phone

4   calls and left a threatening voicemail and a text message on the

5   phone of capital J, period, capital M, period, who is the wife of

6   Kevin McCarthy, who was, at the time, a member of the United

7   States House of Representatives.

8                  Defendant's threats were directed not at him but at

9   the son, whose initials are C, period, M, period.

10                  And you made the following statement in a voicemail:

11  I know where you work.  I know who your coworkers are.  I'm in

12  Las Vegas and I'm coming your way.  So I told your father I'm

13  coming, and I told your father about the law of unintended

14  consequences.  And when I posted on his Facebook page about

15  his -- the budget of him coming back for more, he's a very

16  arrogant and foolish man.  And needless to say, unfortunately,

17  you're the undeserving consequence of his deserving punishment.

18  It's nothing personal.  But when you see me, you'll know.  You'll

19  know and you'll know that even though it's my hand, your father

20  killed you.

21                  Defendant sent this text message to J.M., the wife

22  of -- of K.M., who is the mother of C.M., and additionally,

23  stating anger and frustration with K.M. for carrying out his

24  official duties.

25                  And additionally, defendant said the following in a

1  text message:  I want to look at K in the eye and tell him the

2  hard truth.  He killed -- he did.  Karma and the law of

3  unintended consequences came home to roost.  I want to see the

4  pain when he hears that truth in open court.

5          And defendant sent these messages from Las Vegas,

6  Nevada, to California.  Therefore, they were transmitted in

7  interstate commerce through the referenced messages.

8          Defendant admits that he intended to communicate a

9  threat; that the purpose of defendant's threats were to impede,

10  intimidate, and interfere with K.M. while he was engaged in the

11  performance of his official duties and with the intent to

12  retaliate against K.M. on account of the performance of his

13  official duties.

14          So, are all those facts correct, or should I consider

15  changing any of those?

16          **THE DEFENDANT:**  No, Your Honor.  They're correct.

17          **THE COURT:**  All right.  Anything else,

18  Mr. Operskalski, you want me to ask him about?

19          **MR. OPERSKALSKI:**  No, Your Honor.  Thank you.

20          **THE COURT:**  So, I think that Mr. Hamelin's answers do

21  satisfy the concerns of the Court that were raised by his letter.

22  And so, it sounds like there's not a just and fair reason at this

23  point to allow him to withdraw his guilty plea, and, in fact, it

24  looks like he doesn't want to withdraw his guilty plea.

25          **MS. DIAMOND:**  He doesn't, Your Honor.  I would

1  just -- I would like some clarification, too, just because

2  of -- I didn't like the way Mr. Hamelin phrased some things.

3          **THE COURT:**  Okay.

4          **MS. DIAMOND:**  I just want to make sure that he

5  understands that he's not going to be technically a prisoner.

6  The BOP isn't an alternative to civil commitment.  I think he was

7  saying it like I'll go there technically as a prisoner instead of

8  being civil -- but he will be.  He will be convicted of a felony.

9          **THE DEFENDANT:**  Mm.

10          **MS. DIAMOND:**  Will be in prison.  This is prison.

11          **THE DEFENDANT:**  Yeah.

12          **MS. DIAMOND:**  It's just the best prison able to deal

13  with his mental health.

14          And that was my slight concern for what he said his

15  reasoning was.  I don't want it to seem like or him to think that

16  he's not going to a real prison and being a real prisoner.  It's

17  not an alternative to civil commitment.  It's prison.

18          **THE COURT:**  Right.

19          **THE DEFENDANT:**  Right.

20          **THE COURT:**  Okay.  Well, that's a good point.

21          Mr. Hamelin, I can't guarantee where they're going to

22  send you.  I can recommend they send you to a medical facility.

23  But you'll be a prisoner, and so, you'll be in the custody of the

24  Bureau of Prisons.  And they will transport you and place you

25  wherever they deem to be best.

TRANSCRIBED FROM DIGITAL RECORDING
2:23-cr-00111-GMN-DJA - June 10, 2024          26

1        So, even if they do eventually send you to a medical

2   facility, it might take awhile.  It could take more than 90 days,

3   120 days.  It could take awhile before they even place you there.

4   And even once you're there, if you are ever sent there, they

5   could decide that they have given you treatment and that you're

6   good enough to go back to a regular prison.  And you could end up

7   in a regular prison for a long time.

8        So we don't know what's going to happen.  It's based

9   on a lot of different factors that we just don't know.

10        So you have to be sure that you understand that if I

11   adjudicate you guilty of this charge -- of these charges, you

12   will be a felon.  You will be a prisoner.  You will be an inmate

13   in the Bureau of Prisons potentially up to 15 years, but probably

14   less, but for a long time, and they will place you wherever they

15   deem appropriate.

16        You know, there's a grievance process.  You can ask

17   for changes and things like that, but there's no guarantee that

18   they're going to place you in a medical facility for the entirety

19   of the time that you're in custody.

20        Do you understand that?

21        **THE DEFENDANT:**  I do.

22        **THE COURT:**  All right.  Is that sufficient for you,

23   Ms. Diamond?

24        **MS. DIAMOND:**  Yeah.  And then, one -- sorry.  One

25   additional thing, also, just to clarify.  I'm not trying to be

 1  difficult.  I just want it to be really clear --

 2              **THE DEFENDANT:**  Sure.

 3          **MS. DIAMOND:**  -- Mr. Hamelin is that Mr. Hamelin

 4  stated, I think I heard, that I had advised him that the quickest

 5  way to get treatment would be to take a guilty plea and do

 6  it -- that's -- I just want him to be clear that that's not what

 7  I was intending --

 8              **THE DEFENDANT:**  Okay.

 9          **MS. DIAMOND:**  -- to tell him at all.

10              **THE DEFENDANT:**  Okay.

11          **MS. DIAMOND:**  He wanted -- expressed to me that he

12  wanted to plead guilty per the plea agreement.  And then,

13  separate to that, when this issue arose with him writing the

14  letters to the Court that he had told me about before I had seen

15  them that if his goal in writing the letters was to get to BOP

16  quicker, that wouldn't happen.

17              But I want it to be real clear that my -- I did not

18  advise him to plead guilty as the quickest way to get treatment.

19  And if that's his understanding of -- of my advice, that was not

20  what I intended to convey.

21              **THE DEFENDANT:**  Right.

22          **THE COURT:**  Okay.  Well, that's a good point,

23  Mr. Hamelin.  There's no guarantee that the prison's going to do

24  anything more than what they're already doing for you in Pahrump.

25              **THE DEFENDANT:**  Uh-huh.  Right.

1          **THE COURT:**  As far as, like, the quickest way to get

2    treatment, they might not do anything else.  BOP might just look

3    at all this paperwork and go, Yeah.  Those medications are

4    appropriate.  That's fine.  He doesn't need anything else.

5          And it's just -- goes on and on, the same as always,

6    just the same as what you've been doing for the last year.  It

7    might not be any different.  So I want to be careful with that.

8    There is no quicker way to receive treatment because we don't

9    know what that treatment would be if there even would be a change

10   in treatment.  Might just be these medications for the next 15

11   years and that's it.

12          **THE DEFENDANT:**  Okay.

13          **THE COURT:**  So do you want to take some time -- I

14   don't have to sentence you today.  It's -- we can do it

15   tomorrow --

16          **THE DEFENDANT:**  No.  We can go through with this,

17   Your Honor, because -- and like I said, like I mentioned earlier

18   on the record, you know, I'm going to ask the government.  You

19   know, I know it's not your responsibility because I won't be in

20   your district, but I will ask the government to 4246 me as I get

21   closer to my release out whatever district that I'm in.  You

22   know, you can see to your counterparts.  You know, you can 4246

23   me as I get closer to my release.

24          **MS. DIAMOND:**  Again, Your Honor, sorry.

25          I just want to make real clear, Mr. Hamelin, that you

1  understand that that may never happen, right?

2          **THE DEFENDANT:**  Yeah.

3          **MS. DIAMOND:**  Like you could be -- worst case

4  scenario, you're in a regular prison getting no better treatment

5  than what you're getting in Pahrump, and then you're released to

6  the streets --

7          **THE DEFENDANT:**  Yeah.

8          **MS. DIAMOND:**  -- and you understand that that could

9  happen?

10         **THE DEFENDANT:**  It could happen.  Yeah.

11         **MS. DIAMOND:**  And in terms of them filing for this,

12  right --

13         **THE DEFENDANT:**  Uh-huh.

14         **MS. DIAMOND:**  -- I'm not with the government.  I

15  don't know how often that happens.  My guess is that's extremely

16  rare.  So my expectation is that whenever your sentence is up,

17  you're going to get released to the streets on supervised release

18  and that just because you want them to file this doesn't mean

19  that anyone's ever going to do that.  I want to make sure that

20  you understand that --

21         **THE DEFENDANT:**  Yeah.

22         **MS. DIAMOND:**  -- in this because obviously, I have

23  concerns, as well, because, you know, I just want to make sure

24  that -- that you really are understanding all of this.

25              And again, as the judge has offered, if you -- if you

1  want to take more time to talk to me about this more, we can

2  reset this.  I just want to make sure that -- that you really are

3  clear on worst case scenario.  You go to a regular prison, a

4  regular yard.  You're not getting any different medication than

5  what you're getting right now, and then you're released to the

6  streets.

7          **THE DEFENDANT:**  Right.  Then, then we'll just go

8  through with this process.

9          **THE COURT:**  All right.  So, I think we've talked

10 about a lot of different things.  Probably just too many.  And I

11 think that Mr. Hamelin would benefit from having a little bit

12 more time with Ms. Diamond to make sure that he understands the

13 possible consequences that nobody can guarantee him what's going

14 to happen.  So it's a difficult situation and not one that you

15 should enter in lightly.

16          Like I said, I can fit you in Tuesday or Wednesday.

17 We have quite a bit already.  Tomorrow at 2 p.m. would be

18 available.  Wednesday wouldn't be until 3:30, so I'm not sure how

19 that would work with transportation.  But we could do that, as

20 well.

21          Then the next hearing that I have available is the

22 24th.  So tomorrow's the 11th.  Wednesday is the 12th.

23          So, tomorrow, what did we say, Nick?  Tomorrow at 2

24 p.m. would be open.  Wednesday, it probably wouldn't be till

25 3:30; is that --

TRANSCRIBED FROM DIGITAL RECORDING
2:23-cr-00111-GMN-DJA - June 10, 2024          31

1          **COURTROOM ADMINISTRATOR:**  You have a 2:00 and 2:30 on

2    Wednesday.

3          **THE COURT:**  Yeah.  Is that 2:30 a revo?

4          Yeah.  The 2:30 is a revo, so I can do that in half

5    an hour.  So we could do three o'clock on Wednesday, the 12th.

6    Otherwise, the next date would be Monday, the 24th at 11 a.m.

7          So, Ms. Diamond, you know best your -- your schedule

8    because you just got back from vacation, so I'm sure you've got a

9    lot of things that you need to do.

10          When do you think you can see him and then feel

11    comfortable going forward?

12          We can do it the 24th, Monday.

13          **THE DEFENDANT:**  I don't need any time.  I'm good to

14    go.

15          **MS. DIAMOND:**  Okay.  So, with that in mind, then,

16    Wednesday.  Let's do Wednesday so I've got time to talk to you.

17    Just, I would feel better, and I know -- I can't guarantee I'm

18    going to get a visit with you tomorrow, but I'd like to talk to

19    you.

20          **THE DEFENDANT:**  Okay.

21          **MS. DIAMOND:**  Let's do Wednesday, Your Honor,

22    at -- did you say 3:00 -- three o'clock?

23          Does that work for you, Jake?

24          **MR. OPERSKALSKI:**  Yes, it does.

25          That works for the government, as well, Your Honor.

1        **THE COURT:**  All right.  So, Wednesday, June 12th, at

2   3 p.m.

3        Do we want him here earlier so she can meet with him

4   before the hearing?

5        **MS. DIAMOND:**  I can -- I'll set up a video visit with

6   him, Your Honor, so I'll be able to --

7        **THE COURT:**  Will you be in the building on that day

8   for something else?

9        **MS. DIAMOND:**  I will be in the building.  I have a

10  hearing with Judge Albregts at 2:00, so I'll just come straight

11  here afterwards.  But I can -- if he's transported over -- does

12  he get transported over in the morning with everybody?

13       **THE MARSHALL:**  He'll come in.

14       **MS. DIAMOND:**  So he would be available over

15  at -- perfect.  I can go see him in lockup, as well.

16       **THE COURT:**  Okay.  Does that work for you, Nick?

17       **COURTROOM ADMINISTRATOR:**  Yes, Your Honor.

18       **THE COURT:**  Is the probation office still available?

19       **OFFICER HOLDEN:**  Somebody will definitely be

20  available.

21       **THE COURT:**  Okay.  All right.  Thank you.

22       Then that will be the order.  We'll continue the

23  sentencing hearing so that Ms. Diamond has sufficient time to

24  discuss Mr. Hamelin's letters with him.  The letters will be

25  filed on the docket today, so I can't refer them right now to any

1  docket numbers.  I don't know what docket number they're going to

2  receive.

3           So I'm not going to withdraw his -- his request in

4  his letters yet.  Let's wait until Wednesday.

5           All right.  Anything else from the government you'd

6  like me to address while we're here?

7           **MR. OPERSKALSKI:**  No, Your Honor.  Thank you.

8           **THE COURT:**  Anything else, Ms. Diamond?

9           **MS. DIAMOND:**  No, Your Honor.  Thank you.

10          **THE COURT:**  All right.  Anything else from the

11  probation office?

12          **OFFICER HOLDEN:**  No.  Thank you.

13          **THE COURT:**  All right.  So, then, we'll be back here

14  Wednesday at 3 p.m.  Be off record.  Thank you, Counsel.

15          **MR. OPERSKALSKI:**  Thank you, Your Honor.

16          **COURTROOM ADMINISTRATOR:**  All rise.

17               (*Proceedings adjourned at 10:44 a.m.*)

18                         --o0o--

19

20

21

22

23

24

25

1       I, Paige M. Christian, a court-appointed transcriber,

2  certify that the foregoing is a correct transcript transcribed

3  from the official electronic sound recording of the proceedings

4  in the above-entitled matter.

5

6  Date:  September 16, 2024

7                          /s/ Paige M. Christian
                           Paige M. Christian, RMR, CRR, CCR #955
8                          Official Court Reporter
                           United States District Court
9                          District of Nevada

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25